CITY OF MEMPHIS, Plaintiff in Error, v. JOHN H. TRICE, Admr., Defendant in Error.

Western Section. May 8, 1931.

Petition for Certiorari denied by Supreme Court, December 19, 1931.

Abe D. Waldauer and Walter Chandler, both of Memphis, for plaintiff in error.

Randolph, Randolph & Clifton, of Memphis, for defendant in error.

HEISKELL, J. This is an appeal by the City from a judgment for $7,000 damages for the death of Ray Trice, a boy about seven and a half years of age. We will state the facts so far as we think material, in the terms of the contention of plaintiff.

In the City of Memphis there is a block of property lying on the west side of Delaware Street owned by the Phelan estate. Originally there extended across this property a ravine or deep gully leading to the Mississippi River not far away, which was a natural surface water drain. This ravine, years ago, extended across Delaware Street, but when this street was improved by the City in 1910, a culvert was built across the street at the site of the ravine, to take care of the natural drainage and the street was filled over the culvert. The outlet of the culvert was only a few feet on the Phelan property.

The fill made by the City over the culvert tapered downward on to the Phelan property, so in order to give lateral support to the west margin of the street, and to prevent the fill from sloughing a wooden bulkhead was first built by the City a few feet west of the sidewalk and on the Phelan property. But the discharge of the water from this outlet so near the street, caused the fill to slide and a cave in of the west side of the street and of the sidewalk resulted.

To remedy this dangerous condition the City, a short while later, entered upon the Phelan property under the power of eminent domain, but without taking any notice whatsoever of the property owner, and built a concrete retaining wall on the Phelan property about 30 feet west of the west property line along Delaware Street, which wall originally extended across the ravine from bank to bank. This wall was so built that its top was about seven feet below the grade of Delaware Street and about nine feet below the grade of the yards of the premises on both the north and south sides of the ravine.

Immediately after the completion of the wall, the City partially filled with dirt the space between the street and the wall, and thereafter the City carts dumped, and the City permitted others to dump, refuse and rubbish into this space until finally the space was filled to a level with the street at the sidewalk, but only to within two feet of the top of the retaining wall. The difference in the height of the fill at the wall and at the street made an incline from the street to the wall—a drop of nine feet in about 27 feet, or a fall of one foot in three feet being a grade of 33⅓ per cent.

In the construction of the retaining wall the concrete culvert was extended from the street to the wall, and an opening about five feet square was left in the wall for the culvert outlet, the bottom of this opening being nine feet above the dirt bed of the ravine. The only water which passed through this culvert in dry weather was a small continuous stream which the City had allowed a nearby manufactory to discharge for years into the drain leading to

the culvert. But in rainy weather, surface water of great or less volume according to the rainfall, poured or gushed through the culvert outlet and fell nine feet to the dirt bed of the ravine below. The action of this falling water in course of time eroded a hole in the bed of the ravine immediately at the base of the wall, which hole was about six feet deep and about 20 feet in circumference and extended from bank to bank of the ravine, which banks were very steep. This water hole which was invisible to any one on Delaware Street or on the inclined space (unless one should go to the wall and look over), had existed continuously for years and was continuously filled with water.

During the years the wall had been erected, the surface water which fell on the inclined space, seeking an outlet into the ravine, flowed around the ends of the wall, gradually eroding the dirt between each end of the wall and the adjacent bank of the ravine, until spaces several feet wide were washed out between the ends of the wall and the adjacent banks, which spaces extended from the top of the inclined space to the bed of the ravine, a drop of some 20 feet. These spaces formed precipitous slides, especially at the south end of the wall, extending directly from the top of the inclined space around the end of the wall, to the water-hole beneath.

For years the inclined space on the Phelan property between the street and the wall had been frequented daily by the children of the neighborhood as a place to play. There were on the inclined space, rocks, tin cans and rubbish of all kinds, and one of their diversions was to go to the wall and "chunk" rocks into the water-hole. On the banks of the ravine west of the wall there was much under-growth and trees.

During all this time the sloping space, about 50 feet wide along Delaware Street, had remained unenclosed, both where it abutted Delaware Street and along the north and south banks of the ravine, although there were cottages on both the north and south sides of the ravine and within a few feet of the adjacent ravine banks. There was never a fence or other guard or protection, prior to the accident, in front of the sloping space on Delaware Street nor along the banks of the ravine on the Phelan property. Neither was there any guard or protection of any kind elsewhere on the sloping space or at the retaining wall to protect persons from falling over the wall or around the ends of the wall. There was never any protection whatsoever over or around the water-hole. And there was never a sign or other warning on or about the premises calling attention to the dangerous conditions which existed there.

About six weeks before the accident Joseph H. Trice moved his family to a small workman's cottage on Indiana Street near the corner of Colorado Avenue. Indiana Street is the street next east of Delaware Street and this cottage was thus a little more than a block away from the scene of the accident.

Prior to the accident little Ray Trice had never visited the dangerous spot on the Phelan property where the neighborhood children were accustomed to congregate for play. Neither of his parents had ever given him permission to go there to play and neither one of them knew that he had gone there to play on the day of the accident. Ray was about seven and a half years old and he attended school.

On Saturday, March 24, 1928, his father, having a day off from work, walked with his son Ray about noontime to a grocery several blocks north of their home on Indiana Street. On returning from the grocery, Ray asked permission of his parents to visit a playmate, Irvin Person, who lived on Arkansas Street, the street next east of Indiana Street. This permission was given and Ray left home to visit Irvin. Another playmate, Johnnie Cotton, lived next door to Ray.

Apparently Johnnie, Irvin and Ray met at Irvin's house. All three were about the same age. Irvin had been down to the place in question on the Phelan property on previous occasions to play. Evidently at his suggestion the three boys, without the knowledge or permission of Ray's parents, went there this Saturday noon, just before lunch to play.

When these three boys arrived there, three other small boys were already there playing, viz., Edwin Mayberry and his younger brother and L. E. Aldrich. These three boys were playing along the sidewalk in front of the sloping space, and in the yard of the premises immediately north of the ravine and also on the sloping space. Their play on the sloping space consisted partly in their letting L. E.'s wagon roll down the incline until it was stopped by the retaining wall, whereupon they would run down to the wall, pull the wagon back to the sidewalk and then let it roll down again.

Johnnie, Irvin and Ray when they arrived there, did not play with the other boys, but they immediately went on the sloping space down to the retaining wall and commenced picking up rocks and cans and throwing these over the wall into the water-hole, whereupon they would look over the wall to see the water splash.

After so playing on this place for about half an hour, Johnnie, Irvin and Ray returned to their respective homes. Ray then ate lunch at home. After lunch he again asked permission of his parents to go to Irvin's house, saying nothing about his having

been down to the ravine to play or that he intended to go back there. He was given permission to return to Irvin's house. Again the same three boys met and hurried immediately back to the sloping space where they had played a short while before. Ray's father then lay down to rest and his wife was also at home.

When the three boys again arrived at the sloping space the two Mayberry boys and L. E. Aldrich were still there playing in the same manner as described above. Again Johnnie, Irvin and Ray went immediately on to the inclined space and down to the retaining wall. They played around there for awhile, throwing rocks and cans over the wall into the water hole. Just before the accident the three boys were very near the wall and close to its south end. They commenced throwing rocks at a tin can which was on the south bank of the ravine and a short distance east of the wall. Suddenly Ray and Johnnie darted from their position near the south end of the wall to run and get the can, Ray being in the lead. As Ray ran near the space between the south end of the wall and the ravine bank, he slipped and fell and by reason of the downward slope of the ground his body rolled or slid around the south end of the wall, through the opening between the end of the wall and the ravine bank to the bed of the ravine some 20 feet below and into the water hole at the base of the wall wherein he was drowned.

The suit was against the city and the Phelan heirs jointly. The declaration contained several counts in which it was sought to hold the defendants liable under the theory of common law negligence and also upon the doctrine of attractive nuisance.

To the declaration the City of Memphis filed a demurrer to each and every count thereof. Upon the demurrers of all of the defendants being overruled, to which action of the Court exceptions were reserved, the defendant City of Memphis filed pleas of not guilty, and failure to give statutory notice. Subsequently, the plea of contributory negligence on the part of plaintiff's decedent was added.

The case was tried twice. At the conclusion of plaintiff's proof on the first trial, a motion for directed verdict was sustained as to the second count of the declaration and a directed verdict was given as to the Phelan heirs at the conclusion of all of the proof. The jury was unable to agree on issues submitted as between plaintiff and City of Memphis, and a mistrial resulted.

During the second trial, the Court sustained the motion of the defendant City of Memphis for a directed verdict as to all counts of the declaration except the second and fifth counts, held that the damages sought under the fifth count were merged with those in the second, and permitted the case to go to the jury solely on the

question whether the City of Memphis had maintained an attractive nuisance in connection with the locus in quo where the accident happened.

At the conclusion of this trial, the jury returned a verdict against the City of Memphis on the "attractive nuisance" count of the declaration.

The defendant renewed its motion for a directed verdict and its motion for a new trial, both of which motions were overruled. Thereupon, the defendant prayed an appeal which was granted.

A motion for a directed verdict was made by the City at the conclusion of plaintiff's proof and renewed at end of all the proof. We think plaintiff must succeed if at all on the theory of attractive nuisance. If the city is right in its contention, the motion for a directed verdict should have been sustained. If the case comes under the attractive nuisance doctrine, then the court was right in leaving the case to the jury.

The question of what constitutes an attractive nuisance and what is necessary to create liability under the doctrine has been discussed and defined so often and the cases collated and analyzed so many times, that it seems unnecessary to enter upon an extensive treatment of the vast multitude of cases on the subject. While all the cases cannot be reconciled, we think the principles are sufficiently settled by the preponderance of authority to enable us to decide this case without discussing a great many of the authorities cited.

Counsel for plaintiff rely so strongly upon the T. Clark Smith case as being conclusively in point that it may almost be said they must stand or fall by the authority of that case. That is to say, they so rely upon that case as their strongest authority, if it can be shown that it does not apply here, it should go far to show that the present case is not within the doctrine.

In the Smith case the gravel pile was the attraction and the train supplied the element of danger. The gravel pile was on the right of way of the railroad, in plain view from all directions, from street and residence. Clark Smith was in the habit of playing on the pile and the railroad employees in the habit of seeing him. The attraction of the gravel pile measured up to the language of the decisions, it was not only a temptation, it was an invitation, and the danger was apparent to the railroad employees. In the present case the pond was the instrumentality of danger, but we cannot see anything here so attractive to children as to constitute an invitation. The retaining wall was thirty feet from the line of the street, and the pond beyond the wall. The pond could not be seen from the street, and it was not on property be-

longing to the city. It is insisted that the slope from the street to the retaining wall was attractive, but so is every slope in the city. It is said that children played there. They play everywhere. There is no feature in this case to be compared with the gravel pile in the Smith case as an invitation to the plaintiff to be in the place of danger. It is shown by plaintiff that the sides of the original gulch west of the retaining wall are very steep. The same danger might have been incurred by children playing upon the lots fronting on this gulch west of the retaining wall where the city had not changed the slope of the ravine. Suppose in the Smith case instead of the gravel pile, the children had chosen to slide down the side of a cut on the railroad. It would have made a very different case. In addition to this, there was nothing in the situation in the present case to cause employees of the city to apprehend danger to the children as in the Smith case. It is not contended for plaintiff that any actual notice of the danger was brought to the knowledge of city officials or employees, and there is testimony by a number of persons connected with the city that they had no such notice and no apprehension of danger.

The well nigh if not quite universal rule is that the owner of land upon which there is a pond is not liable by reason of a child being drowned in the pond unless there is some element of invitation, either express or by virtue of some attraction, or unless there is some trap which cannot be seen until too late. There is a class of cases of which Doyle v. Chattanooga, 128 Tenn., 433, and Davoren v. Kansas City, 40 A. L. R. (Mo.), 473, are typical, in which a city is held liable where the pond is in the street. These cases are based upon the reason as stated in the Doyle case that there is an invitation given by the city to all persons to go upon the street. In view of this invitation the City is bound to keep its streets safe for adults as well as children. This distinction is too well settled to require authority. If a landowner excavates into the side of a street so that injury results to one passing along the street, the land owner is liable, but is not bound to fence his pond against even small children.

The cases show a difference between the liability of a city for a condition on its streets and that of a private owner for a similar condition on his own land, because of the invitation to be on the street. But in Murphy v. City of Brooklyn, 118 N. Y., 579, the Court says the rule is the same as to a city and a private owner where the condition is created by the city on private property by the consent of the owner. That is outside of its streets and on private land. In such case if the private owner is not liable, the city is not. That is the present case.

The case of Raeside v. Sioux City et al., 229 N. W., 216, in which the opinion was delivered February 18, 1930, is very much like the present case. In that case the city constructed a storm sewer outlet and retaining wall on private property, close to the street "the object and purpose of said sewer being to drain storm water from the various streets of the defendant City, Sioux City, and divert the storm water from its natural drainage, to deposit the said storm water in and upon the lands of the defendant Lewis." A pit or pond was formed which was seven or eight feet deep at a distance of ten feet from the mouth of the sewer. The minor son of plaintiff, about eight years of age, playing around this pond with other children fell in and was drowned. There were demurrers filed by both defendants, the city and the owner of the land. The demurrers were sustained and on appeal the action of the lower court was affirmed on the ground that the condition did not constitute an attractive nuisance. As shown in the opinion in the Raeside case, the Iowa Court recognizes the attractive nuisance doctrine but held that the facts alleged did not warrant its application against either land owner or city. In support of this holding, the Iowa court cites more than twenty-five cases from many different states.

Another element entering into the question of liability is the ease or difficulty of rendering the attractive and dangerous instrumentality safe as to children. In the Turntable cases and in Whirley v. Whitman, 28 Tenn., 610, and in other cases, the Courts speak of how easy and inexpensive it would be to lock the turntable and box up the moving cog wheels. On the contrary, in the case of Sullivan v. Huidekoper (1905), 5 L. R. A. (N. S.), 63, a pond had been formed by reason of the construction of a city street. Near this pond children were accustomed to play. A ten year old boy fell in and drowned. Although no effort had been made to fill the pond or to drain off the water or to fence this pond the city was held not liable on the ground that the element of an unknown, concealed or hidden danger was absent, and that the likelihood of danger was small, and the difficulty of guarding against it was great. The Court said:

> "The danger of children who go to swim in ponds and other bodies of water is remote, and accidents are comparatively of rare occurrence. To hold an owner of real estate upon which there is a body of water liable for the accidents that may happen to children while trespassing thereon would be to place upon them an unfair burden. The danger is one that cannot be guarded against without considerable expense or inconvenience. The cases holding that there is no duty upon

the part of the real estate owner upon whose land is a pond or other body of water, to keep his land safe for trespassers, even when those trespassers are children, seem to us to be founded upon and supported by reason and common sense. The primary duty to guard and protect a child against patent and unconcealed dangers devolves upon the parent, and not upon a stranger. These cases, while approving the so-called 'turn-table' doctrine, distinguished between attractive and dangerous machinery and ponds and other bodies of water attractive to children, and not free from danger. . . . We do not consider that the appellee was negligent in not taking steps to prevent the trespassing upon her land by boys of such age as plaintiff's intestate. To hold land owners responsible under such circumstances would be to impose upon them an oppressive burden, and shift the care of children from their parents to strangers. Every man who has been brought up with the freedom allowed to American boys knows that you might as well try to dam the Nile with bulrushes as to keep boys away from ponds, pools and other bodies of water.''

In Emond v. Kimberly-Clark Company, 15 Wis., 83, 149 N. W., 760, where the owner of the land for the purpose of obtaining water for fire protection, constructed a dam in close proximity to the main street of the town, thereby creating a pool thirty by forty feet. Over the top of the dam was an overflow gate which rendered the same particularly attractive to children, and alluring to children of tender age. The owner knew that children frequented this place, and it was unfenced and unguarded. In denying liability, the Court said:

"The world cannot be made danger-proof—especially to children. To require all natural or artificial streams or ponds so located as to endanger the safety of children, to be fenced or guarded would, in the ordinary settled community, practically include all streams or ponds, be they in public parks or upon private soil, for children are self constituted licensees, if not trespassers, everywhere. And to construct a boy proof fence at a reasonable cost, would tax the inventive genius of an Edison.''

The proof in the present case shows that children could enter this ravine for play without coming from the street, in fact it is shown that they did play in the yard north of the ravine and that there was no fence on the ravine and this part of the ravine had not been changed by the City.

Peters v. Bowman, 115 Cal., 345, 56 Am. St. Rep., 106, 47 Pac. 113, 598, was a case where it appeared that the defendant per-

mitted a pond to remain on his premises unguarded and unfenced. Children played upon it, and one of them, a boy of eleven, while floating on a raft, fell off and was drowned. The court also recognized and approved the "turntable" cases, but said: "A body of water, either standing as in ponds or lakes, or running as in rivers and creeks, or ebbing and flowing as on the shores of seas and bays, is a natural object incident to all countries which are not deserts. Such a body of water may be found in, or close to, nearly every city or town in the land; the danger of drowning in it is an apparent, open danger, the knowledge of which is common to all; and there is no just view consistent with recognized rights of property owners which would compel one owning land upon which such water, or part of it, stands, or flows, to fill it up, or surround it with an impenetrable wall."

On a petition for rehearing it was said: "A turntable is not only a danger specially created by the act of the owner, but it is a danger of a different kind to those which exist in the order of nature. A pond although artificially created, is in nowise different from those natural ponds and streams which exist everywhere, and which involve the same dangers and present the same appearance and the same attractions to children. . . . A pond cannot be rendered inaccessible to boys by any ordinary means. Certainly no ordinary fence around the lot . . . would answer the purpose; and, therefore, to make it safe, it must either be filled or drained. . . . But ponds are always useful, and often necessary. . . . Are we to hold that every owner of a pond or reservoir is liable in damages for any child that comes uninvited upon his premises and happens to fall in the water and drown? If so, then upon the same principle, must the owner of a fruit tree be held liable for the death or injury of a child who, attracted by the fruit, climbs into the branches and falls out. But this, we imagine, is an absurdity, for which no one would contend; and it proves that the rule of the turntable cases does not rest upon a principle so broad and of such rigid application as counsel supposes. The owner of a thing dangerous and attractive to children is not always and universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural and common or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in short, to the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions."

There are many other cases to the same effect showing among other reasons given the importance attached to the difficulty of

making places safe for children. In case of a private owner if he has many places of possible danger, it would be obligatory not only to safeguard one but all of them. In case of a city, it is almost inconceivable what this would mean. Every viaduct separating the grade of street and railroad makes a place of danger for children, yet they are considered essential to promote safety in traffic. At one end of such viaducts leading from the higher to the lower level, from railroad to street or vice versa, will be seen steep and worn pathways, more or less dangerous, very much like the condition complained of in the present case at the ends of the retaining wall. Then all city parks have ponds or lakes, waterscapes intended for scenic beauty. To protect them from children by billboard fences would destroy the purpose of their existence. Every bridge across a bayou affords a place from which children may fall into water. No railing is a sure protection and it is impossible to prevent a child from finding some place at the end of a bridge where he can slide down a bank. The cases above cited show that these considerations are causing the reason and common sense of the Courts to say to the doctrine of the turntable cases ''thus far shalt thou go and no further.''

There are a number of cases holding that a retaining wall from which children may fall is not an attractive nuisance. The following are a few of these: Heagage v. District of Columbia, 42 App. D. C., 109; Coon v. Kentucky & I. Terminal R. R. Co., 163 Ky., 223; 173 S. W., 325; Kayser v. Lindell, 73 Minn., 123; State ex rel. Kansas City v. Ellison (1920), 281 Mo. 667, 220 S. W., 498.

Counsel for plaintiff insist most stoutly that this is not a pond case; that the pond was not the attraction, yet they seem to attach weight to the fact that the boys liked to chunk rocks and tin cans into the water and see it splash. Counsel insist that this was one of their favorite diversions. Presumably the child was running to get a can for this purpose when he fell. If he had fallen over the retaining wall it would have been contended that the city was liable. The only feature of the situation that can be insisted on as supplying the invitation by attraction is the place where children could play. They could play and did play in the yard fronting on the ravine west of the retaining wall which was steep, but had not been changed by the city. It certainly cannot be contended that the city must fence this ravine to the river. Then what about bluffs, or steep inclines running down to the river? As to the steep places at ends of the retaining wall, we can find this same condition at many places. Every bridge and every viaduct has a retaining wall at each end and almost invariably a steep, worn pathway leading down the embankment. A child rolling down

such a declivity might roll in front of an automobile on the street and be injured or killed without fault of the driver of the car. The City cannot safeguard all these places.

The illustration of the fruit tree used by the Court in Peters v. Bowman, supra, is striking at least. The fruit tree has all the elements of a perfect attractive nuisance. It can be seen from the road. It cannot be concealed. There is nothing more attractive to a boy than apples on a tree. They are far more attractive in that situation than on a platter or in the hands of unemployment on a street corner. Apples on a tree are not only a temptation, they are an invitation. To climb for them is also an attraction. Only old age fears that which is high, the boy loves to climb. The ambitious courtier might well say he fain would climb but feared to fall. The boy's ambition is subject to no such limitation, yet climbing is always dangerous and many boys have been hurt and killed in falling from trees. The apples are attractive whether big and red or small and green. If green they carry with them other danger than that of falling from the tree. So we have in the fruit tree the hyperbole of attraction carrying its own danger like the turntable. Then it is artificial. The tree is grown by the owner; it does not exist in a state of nature. Yet notwithstanding all these elements of an attractive nuisance, the court in the 115 California case says the idea of so applying the doctrine would be an absurdity for which no one would contend. It was some such considerations which led the Court in McKiddy v. DesMoines Electric Co., 202 Iowa, 225, 206 N. W., 815, while recognizing the attractive nuisance doctrine to say: "Of necessity it (the Court) has allowed or denied application of the doctrine as the particular facts of each case would justify or require. . . . No hard and fast rule of liability or non-liability can be fixed in this regard." In other words if we catch the idea it is that after all distinctions have been made, there will remain a class of cases difficult to distinguish in principle from the turntable class, yet in which common sense, reason and justice declare it would not do to apply the doctrine.

A multitude of cases are cited on both sides of this controversy. Many are cited by counsel for plaintiff, some of which go far to support their contention, but where not distinguishable we think they are not in accord with the weight of authority in this and other states. For the reasons which we have attempted to set out in this opinion, we conclude that the motion for directed verdict on the part of the city should have been sustained. The undisputed facts, or the facts according to plaintiff's proof, do not make a case of liability under the doctrine of attractive nuisance and the city is clearly not liable on any other ground. The scene of the

accident was not on city property, nor in any place like a street which the city was bound to keep safe for the public. The place itself did not, like a street offer an invitation to any one to be present. There was no element of attractiveness to supply an invitation to children to be present. The fact that they played there means nothing more than that they play on any vacant space about the city. Then to hold the city liable under the facts of this case would impose obligations, in the way of protecting children from possible danger, not only burdensome but impossible to be complied with. The courts in many cases discuss the futility of fences, and guard rails as against the danger seeking propensity of children. If Ray Trice in the present case had fallen over the retaining wall, the same claim would have been made and in Coon v. Kentucky & I. Terminal R. R. Co., 163 Ky., 223, the court discusses the impracticability of making safe the top of a retaining wall. Therefore we conclude that the trial court should have directed a verdict for the city.

The view we take of the case makes it unnecessary to dispose of the other assignments of error of defendant based upon the charge of the Court and upon requests refused.

The plaintiff also prosecuted an appeal and claims that the Court erred in granting a directed verdict on the first trial in favor of Mary E. Phelan and on both trials in directing a verdict as to the city as to those counts of the declaration based on common law negligence. For the reasons given in this opinion we think these contentions are not well taken.

Then plaintiff with much earnestness insists that the Court erred on the second trial in allowing defendant to amend its motion to set aside the verdict by consolidating therewith a motion for a new trial. The contention is that by making a motion to set aside the verdict the defendant waived its right to file a motion for a new trial.

Counsel for plaintiff insist that the motion by the city was for judgment non obstante veredicto and cites authority to support the contention that after such motion a motion for new trial cannot be presented. It is also contended that defendant's motion for a new trial was not filed according to the rule of court. Counsel for defendant insist that the first motion was not for judgment non obstante veredicto, but a motion for a directed verdict which of course involved setting aside the verdict in order to direct a verdict. When counsel for plaintiff stated to the court their contention that counsel for the city had filed a motion for a judgment non obstante veredicto the court said: ''Oh, no, the motion he is making is not a motion non obstante veredicto, but it is a motion

to set aside the verdict of the jury and sustain now his motion for a directed verdict made by him at the conclusion of all the evidence in the case his contention being that I ought to have done it then.''

On April 5, 1930, plaintiff's motion for a new trial was up for hearing and Mr. Waldauer was present representing the city. After plaintiff's motion for a new trial was overruled, Mr. Waldauer stated his motion just referred to, seeking a directed verdict and said that opposing counsel insisted that if he argued that motion he would be precluded from presenting a motion for a new trial which he had prepared, and asked leave to file said motion for a new trial in addition to his motion already filed. The Court said:

''Well, they are usually put together. The first ground of the motion is generally that the verdict of the jury be set aside and that the Court do now what the Court should have done at the conclusion of all the testimony in the case, namely sustain the defendant's motion for a directed verdict and dismiss the case. And then, if the Court overrules that ground of your motion, then it is followed by a motion for a new trial.''

The Court allowed the motion for a new trial to be consolidated with the former motion. Counsel on both sides being present the Court suggested that defendant's motions be disposed of. Counsel for plaintiff at first objected to taking up the motion for a new trial on the ground that they were not ready. After some questions to counsel for city as to their grounds for asking a new trial, the transcript contains this:

''THE COURT: I think we can dispose of it.

''MR. RANDOLPH: Well, all right.

''THE COURT: At least submit it, and then I can hear from you further as to any particular things you want, on brief.

''MR. RANDOLPH: All right.''

The result was the motions of defendant were argued by counsel for both plaintiff and defendant and overruled by the court. Counsel for plaintiff now move this Court to dismiss the defendant's appeal and affirm the judgment because the defendant had lost the right to file a motion for a new trial and because the motion was not actually filed but was heard and overruled by the Court without being filed separate and apart from the motion for a directed verdict.

Upon this record we cannot say that the defendant is not entitled to maintain its appeal for want of a motion for new trial. The motion for a directed verdict was only a part and a proper part of the motion for new trial, and therefore it was not error to allow them to be consolidated and heard together.

"The Supreme Court of Tennessee, in Barnes v. Noel, 131 Tenn., 131, says:

" 'The office of a motion for a new trial is not alone to secure another hearing, but to present the errors complained of for correction, if possible, without another hearing. 14 Enc. Pl. & Pr. 846; 2 Elliott on Gen. Pr., Sec. 987, cited and approved in Railroad v. Johnson, 114 Tenn., 632, 88 S. W., 169.

" 'So it is permissible in the motion for a new trial for the losing party to question the action of the court in refusing him peremptory instructions. This is an error that can be remedied by correcting the verdict as before pointed out. At the same time the attention of the court may be called to other errors, such as errors in the charge or in the admission or exclusion of evidence, which errors cannot ordinarily be corrected, but which entitle the party to another hearing.

" 'A motion for peremptory instructions is not a waiver of other objections (King v. Cox, 126 Tenn., 553, 151 S. W., 58), nor should reliance on other matters in the motion for a new trial be held a waiver of the motion for peremptory instructions. The settled policy in this state is to give the unsuccessful party below the right to have a review on appeal of every question properly made and preserved by him.' "

In the case of Bostick v. Thomas (1916), 137 Tenn., 99, Mr. Justice Lansden, after stating that a motion for a new trial was necessary to test the correctness of the action of the trial court in allowing or disallowing a motion for peremptory instruction, said:

"If the trial judge, upon the consideration of the motion for a new trial, deems that he has erroneously denied a motion for a directed verdict, it is his duty in considering the motion for a new trial to correct such error and direct a verdict. When such action is taken by the trial judge, the appeal is not from his act awarding the new trial, because such action is not final, and therefore not appealable; but the appeal is from the directed verdict and the judgment thereon. In order for the appellate Court to consider the evidence upon which the trial judge directed a verdict, it is necessary that there should be a motion for a new trial."

In Woolworth v. Connors (1919), 142 Tenn., 687, the court said:

"The reason for the rule, requiring that a motion for a peremptory instruction must be assigned as error in a motion for a new trial, is to give the trial court an opportunity to correct the error previously made, and to avoid burdening the higher court with the work of correcting errors which the trial court could have corrected. The error committed by the trial court was in not holding that, as a matter of law, the defense of probable cause had been made out, and directing a verdict for the plaintiff in error."

Then as to the contention that the motion for new trial was not actually filed as a separate paper: The Court insisted on taking up and disposing of the motion; counsel for plaintiff were present and were heard in argument and the Court decided the motion in their favor. What more could have been accomplished by a formal filing of the motion separate and apart from the plea already filed? We think this is not embraced in plaintiff's assignments of error, but is covered by the motion to dismiss and affirm. All of plaintiff's assignments are overruled; also the motion to dismiss defendant's appeal and affirm the judgment is denied.

For the reasons given the judgment of the Court below is reversed and the suit is dismissed.

Owen and Senter, JJ., concur.