RAY v. HUTCHISON.—68 S. W. (2d) 948.

Middle Section. April 25, 1933.

Petition for Certiorari denied by Supreme Court, March 10, 1934.

Kannard & Kannard, of Nashville, for plaintiff in error, Ray.

Lee Douglas and C. Wade Wilkes, both of Nashville, for defendant in error, Hutchison.

FAW, P. J. This action was instituted in the circuit court of Davidson county by Clarence Ray, a boy between four and five years of age, suing by his mother, Minnie Ray, as next friend, against Albert W. Hutchison, to recover $5,000 as damages for personal injuries suffered by the infant plaintiff as the result of alleged negligence of the defendant.

The case went to trial before a jury in the Second circuit court of Davidson county on the issues made by the defendant's plea of not guilty to the plaintiff's declaration, and, at the close of the plaintiff's evidence in chief, the court, on motion of the defendant, gave the jury peremptory instructions to return a verdict for the defend-

ant, which was done by the jury, and the court thereupon dismissed plaintiff's suit, at the cost of the plaintiff.

A motion for a new trial on behalf of plaintiff was made and over-ruled, and thereupon plaintiff prayed, obtained, and perfected an appeal in the nature of a writ of error to this court, and is here in-sisting, through his assignments of error, that the trial court erred in sustaining defendant's motion for a directed verdict and dis-missing plaintiff's action.

In the trial court, the plaintiff sought to predicate his cause of action upon the "attractive nuisance doctrine." The averments of his declaration are as follows:

"That the defendant, Albert W. Hutchison, is a general contractor, and as such pursues the business of constructing, repairing and paint-ing buildings, plants, streets, sidewalks, etc., and that in such work it is necessary for him to have and own a considerable amount of heavy pieces of lumber, scaffoldings and wooden horses, used for scaf-folding purposes; that the above mentioned horses are made out of pieces of timber about two inches thick, about four inches wide and six or seven feet in length; that these horses are constructed out of these pieces of timber in such a way that when completed they stand on the ground above five feet in height and consist of four legs at-tached at the top to the ends of a heavy piece of timber about six feet in length; that two of these legs are nailed at each end of the top piece and spread out at the bottom where they touch the ground, so that the feet or bottom end of these legs are some three or four feet apart. These horses are constructed so that when set upon the ground, or upon any other solid place, plank and timber can be placed upon the top of the same in such a way that the same will constitute a platform or scaffold upon which people can stand in doing work.

"That a few days prior to May 14, 1931, the defendant, Albert W. Hutchison, piled and stored upon an unfenced, unprotected and un-guarded vacant lot and about twenty-five or thirty feet from the little home on the back of lot No. 1816 Cedar Street, Nashville, Tennessee, where plaintiff was living with his mother and next friend, Minnie Ray, some fifty or sixty of these wooden horses, together with a lot of heavy pieces of timber and plank; that in doing so the defendant placed said horses and timber upon said lot in an exceedingly care-less, promiscuous and topsy turvy way, so that the same could be easily shaken, toppled over or knocked down; that the said horses, timber and plank were piled upon top of each other without any regard for the way in which they were so piled and without regard for the safety of children playing around the same. That the vacant lot upon which this lumber and stuff was stored and piled by the defendant, is a sloping lot, the same sloping from the outer edge or end of the same toward the little home or house in which plaintiff was living with his mother and next friend; and the defendant, by his

agents or servants, placed two of the horses, above described, right at the edge of said lot nearest plaintiff's mother's home with the ends thereof extending out from the edge of said promiscuous pile of lumber and horses, toward said home and across the top of these two horses which were located some eight or ten feet apart, there was piled or placed by the defendant, his agents or servants, one or two heavy plank boards; that these two horses were upon sloping ground which sloped toward plaintiff's home, and the defendant, his agents or servants, placed rocks under the lower legs of said horses in order to make the top of said horses as near level as possible. That the vacant lot upon which these wooden horses, plank and timber were stored and piled is in close proximity to several colored families, who have many small children of tender ages, and that the pile of scaffolding, lumber and horses, as above described, after being piled upon said lot, as aforesaid, became and was an attractive place for small children to play around and upon and constituted an attractive nuisance.

"That the defendant was guilty of the grossest kind of negligence in piling and storing the above described wooden horses, lumber, etc., upon this unfenced vacant lot in the way and manner as above set forth; that such pile of wooden horses, lumber and timber was left by the defendant, his agents or servants, after the same was piled upon said vacant lot in a very dangerous condition; that the same was known by the defendant, his agents or servants, to be a very dangerous place for children to be about and around, or should have been so known by them had they exercised any degree whatever of common sense and prudence; that this pile of lumber and timber, as left by the defendant, his agents or servants, upon said vacant lot constituted a dangerous trap, not only for small children who might be attracted thereby, but even to people of mature age.

"That late in the afternoon of May 14, 1931, plaintiff, who is a small boy of only four years of age, with other small children, was playing around and upon this pile of wooden horses, timbers and lumber, and in so doing attempted to climb upon, took hold of or came in contact with one of the two horses across which the heavy pieces of plank or timber were piled, as aforesaid, causing the same to fall over and upon plaintiff, breaking his left leg above the knee and otherwise bruising and cutting his legs and body, which caused him to be taken to the General Hospital in the City of Nashville, where he remained for five weeks; that on account of his injury he suffered much pain and mental anguish, and is still suffering and is permanently injured; that his injury from which he suffered pain and mental anguish, was caused by the gross and careless negligence of the defendant, his agents or servants, in storing and piling the above mentioned wooden horses, timbers and lumber upon said vacant space of ground in such a way as aforesaid, to be dangerous to small

children like the plaintiff playing around and upon the same, and in such a way that the same was an attractive nuisance and place to play to children of tender age, like plaintiff, and that said gross negligence upon the part of the defendant, his agents or servants, as aforesaid, was the proximate cause of plaintiff's injuries, for which he sues, as aforesaid, by his next friend, Minnie Ray, for the sum of $5,000, and demands a jury to try his case.''

During the period of time covered by the events involved in this case, the plaintiff's witness Frank Douglas occupied, as a tenant, a house and lot known as No. 1820 Cedar street in the city of Nashville. This lot was on the north side of Cedar street—the general direction of Cedar street being east and west—and the house in which Douglas lived was on the south end of the lot, fronting on Cedar street, and the lot was about 30 feet wide and extended northward between parallel lines to an alley in the rear, which alley connected Nineteenth avenue on the east with Twentieth avenue on the west.

Plaintiff lived with his mother in a small house which fronted on the aforesaid alley at the rear, or north, end of the lot numbered 1816 Cedar street. There was a vacant lot about 30 feet wide between the home of plaintiff and the aforesaid Frank Douglas lot, and there was a fence along the entire west line of the Douglas lot from Cedar street to the alley, but otherwise the locus in quo was unfenced. The fence just mentioned was about 100 feet from and west of 19th avenue.

The Frank Douglas lot was in a thickly settled residence neighborhood; that is to say, there were homes in which many children, both white and colored, lived in close proximity thereto, along Cedar street, Nineteenth avenue, and the north side of the alley before mentioned.

In the spring of 1931, probably beginning in March, defendant Hutchison, pursuant to a rental contract with Frank Douglas, stored about seventy-two ''wooden horses'' and some mortar boards and other lumber in the vacant ''back yard'' of the Frank Douglas lot before described. So far as appears, the defendant did not supervise or assist in the placing of these materials on the Douglas lot, but they were brought there in defendant's truck by John Nelson and ''stacked'' by Frank Douglas and John Nelson, both of whom were employees of defendant Hutchison.

According to the testimony of plaintiff's witness Frank Douglas, he had had thirty-three years' experience in stacking lumber, and John Nelson had experience in stacking lumber. Douglas states that he was there when each load was brought and stacked, and his testimony as to the manner in which it was all stacked is as follows:

''This lumber was stacked perfectly straight, all of them sitting right on top of one another, and plumb level, rocks set under that where it was low at. In addition to some horses, I stacked some mortar boards and planks. When I stacked it, as each load was un-

loaded, the method I pursued in stacking it, was I tried to stack it perfectly straight, and I have never stacked any unstraight yet. I have put up as much as five or six hundred and the top boards on them and they never fell over. I think they were plumb safe. . . .

"As these horses were delivered, and the lumber was delivered, the horses were stacked by standing them up on their legs, just as they are now. The lumber was stacked over in the middle of the yard, one stack on top of another. All this lumber and these horses were stacked on my property. There was a fence that separated my property on the west from another man's property next door, and the horses that were over there did not fall there, and they were not just thrown over there careless like; they were stacked there carefully with the permission of the owner. These horses were stacked towards that fence, directly against the fence and some over the fence, and some were on the other side. They were not stacked in a loose and promiscuous manner. Every one of them was stacked securely and perfectly safe. I think there were seventy-two horses delivered and stacked. After I had stacked these horses, one on top of the other, in the way that I have said, I was on the premises pretty well all the time that I wasn't at work and observed and watched them. I don't know exactly how much time I spent around there. I couldn't hardly say, but the biggest portion of it, because there wasn't very much doing at that time. When I put those horses there, they were not shakey or rickety. They were firm and solid, the way they are sitting there. They were not in a shakey, rickety condition, but as firm and solid as these sitting here. I know the little Ray boy that it is claimed has been hurt. It would take much force, it would take a whole lot of weight to pull a horse down from where it was, because one of them would weigh seventy-five or eighty pounds, and a kid like that couldn't pull it down, and I don't see how the trestle could have fallen on him. When this lumber was first delivered there, Mr. Hutchison told me to put it down perfectly straight and to take good time to place it, and I did so."

However, there was testimony by other witnesses for plaintiff to support the averments of the declaration that the horses and mortar boards were placed upon the Douglas lot "in an exceedingly careless, promiscuous and topsy turvy way, so that the same could be easily shaken, toppled over or knocked down; that the said horses, timber and plank were piled up on top of each other without any regard for the way in which they were so piled and without regard for the safety of children playing around the same."

There was evidence that the pile of "wooden horses" and mortar boards was about 40 feet in length from the alley southward, about 15 feet wide at the bottom from the fence eastward, and about 15 feet high.

■ If the point of conflict between Frank Douglas and other witnesses, as just indicated, involved a determinative issue of fact, it was necessary to submit the case to the jury, although all the witnesses were introduced by the plaintiff.

When Frank Douglas was called as a witness, one of plaintiff's attorneys stated to the court that he (Douglas) was introduced "for the purpose of showing the ownership of the wooden horses, mortar boards and lumber, and he had it stored on the back end of the premises, and that this witness was called by the plaintiff for this purpose alone." The examination in chief of Frank Douglas was limited to the subject thus stated by plaintiff's attorney, and that part of the testimony of Douglas which we have hereinbefore quoted was delivered on cross-examination by one of the attorneys for defendant, to which cross-examination plaintiff's attorneys objected unless defendant made Douglas his witness as to all matters except those about which the witness had been examined in chief.

■ Although it is otherwise in some jurisdictions, the rule in this state is that cross-examination is limited only by relevancy and competency of the evidence, and in the instant case defendant had the right, on cross-examination, to elicit from the witness Frank Douglas any matter pertinent to the issue, and by examining him about matters not brought out in his examination in chief defendant did not make Douglas his witness. Sands v. Southern Railway Co., 108 Tenn., 1, 6, 64 S. W., 478; Cooley v. Galyon, 109 Tenn., 1, 8, 70 S. W., 607, 60 L. R. A., 139, 97 Am. St. Rep., 823; Hale v. Johnston, 140 Tenn., 182, 202, 203 S. W., 949.

■ But the rule that a party may not impeach the truthfulness of his own witness does not mean that he may not prove the averments of his pleadings by other witnesses, although he thereby disproves the truth of statements of his own witness. History of a Lawsuit (Martin), page 282.

However, for reasons which will be presently stated, we do not think this conflict between Frank Douglas and other witnesses, with respect to the manner in which the wooden horses were piled, was material to the result in this case.

Plaintiff's leg was broken shortly after nightfall on May 14, 1931. So far as appears, no one saw the accident, and there is therefore no direct evidence of the manner in which it occurred. Plaintiff's mother, Minnie Ray, testified, in part, as follows:

"On the day the accident happened, I went to my mother's house to eat supper. Her name is Louise Pointer. When I came home, I was bringing the baby's clothes and went around to this door, and told Clarence to come on in the house, and I went around to the back to carry in the clothes, and I thought he was too, and as soon as I got in the other room, he screamed 'I'm hurt, I'm hurt.' I ran back there to see who it was. I found this horse right across him and a

mortar board on top of that. It scared me so bad I couldn't pick him up. They were right down in front of this pile on Frank Douglas's back lot when they fell on him. When I got there, the boy was lying there. He had done got the other leg out. Another girl came and carried him in the house for me, and I saw his leg was broke. It was just swinging like this, and he was screaming, and I seed this leg was broke. I think it was his left leg, or right one; now I have done forgot which one it was. Anyway it was broken. It was broke up here, right there (indicating). I got Ransom's ambulance and carried him to the City Hospital. They took him to the X-Ray room and examined his leg. His leg was broke. He stayed at the City Hospital five weeks. He wasn't able to walk under three weeks after he came out. He kept the cast on two weeks and two days after he got home, and then he taken it off and he was about a week before he could bear it to the floor."

On cross-examination Minnie Ray testified further as follows:

"I was right there at home at the time this accident happened. I was in my house, and didn't see the accident. I didn't see it when it fell on the child, but no sooner it fell on him and he hollered and I ran to him. It was just barely dark. I guess it was about five-thirty or five o'clock or something like that. And the first I heard was a scream. I went in one door and told him to come in the other door, he was behind me, and I says, 'come on in the other door.' I went to get the clothes and take them in, and just as I turned my back, he hollered, it wasn't three minutes. I was in my room at the time and ran to the place where the accident occurred. I saw another little boy in the yard. When I came up to where the accident occurred, he wasn't there. I didn't see the little boy. He was at his house. I didn't hear him, I saw him, sure, but he wasn't out there with the child. After I ran out to the scene of the accident, I didn't see him at all."

The above-quoted testimony of Minnie Ray is the only evidence tending to show that defendant's wooden horses had any connection with plaintiff's injury.

It is quite clear that the plaintiff was an intruder or trespasser on the premises whereon he was injured, and the only duty which the owner or occupier ordinarily owes to trespassers is to refrain from willfully or wantonly injuring them.

But the rule just stated has been modified very generally in this country by the "attractive nuisance doctrine," which, broadly stated, is that one who has that on his own premises, or who creates a condition on the premises of another, or in a public place, which may reasonably be apprehended to be a source of danger to children of tender years, is under a duty to take such precautions as a reasonably prudent person would take to prevent injury to such children whom he knows to be accustomed to resort there, or who may, by reason of

something there which may be expected to attract them, come there to play.

The above definition is taken from an exhaustive annotation on the subject of "Attractive Nuisances" in 36 A. L. R., pages 34-294, which is supplemented in 53 A. L. R., page 1344 et seq., and 60 A. L. R., page 1444 et seq. An earlier case note on the same subject is found in 19 L. R. A., pages 1094, 1165.

The attractive nuisance doctrine, as above broadly defined, is subject to numerous limitations, particularly in the more recent cases, which will be seen from an examination of the annotations above cited.

In 36 A. L. R., supra, pages 99, 100, the opinions of the Supreme Court of this state (prior to the year of 1925) on this subject are briefly digested as follows:

"In Tennessee it is held that the fact that a child was trespassing when it was injured does not preclude recovery. See Whirley v. Whiteman (1858), 1 Head, 610 (exposed cog-wheels); East Tennessee & W. N. C. R. Co. v. Cargille (1900), 105 Tenn., 628, 59 S. W., 141, 9 Am. Neg. Rep., 200 (turntable); Burke v. Ellis (1900), 105 Tenn., 702, 58 S. W., 855 (car loaded with earth)—disapproved in Foster-Herbert Cut Stone Co. v. Pugh (1905), 115 Tenn., 688, 4 L. R. A. (N. S.), 804, 112 Am. St. Rep., 881, 91 S. W., 199, 19 Am. Neg. Rep., 553.

"It is necessary to the applicability of the doctrine that the owner should have created the danger or have actual knowledge of it (Cooper v. Overton (1899), 102 Tenn., 222, 45 L. R. A., 591, 73 Am. St. Rep., 864, 52 S. W., 183; and there is no liability where the cause of injury is not connected with the attraction. (Louisville & N. R. Co. v. Ray (1910), 124 Tenn., 16, 134 S. W., 858, Ann. Cas., 1912D, 910.)

"In Louisville & N. R. Co. v. Ray, supra, it is said that the recent authorities have shown a disposition to limit the application of the doctrine; and that it is to be noted that in all the cases the court itself has, in one form or another, determined the subjects to which the doctrine applies.

"The difficulties standing in the way of recovery where the child is a trespasser are not present where the attractive object is in a place within the limits of a public street, where the child has a right to go. Doyle v. Chattanooga (1913), 128 Tenn., 433, 161 S. W., 997, Ann. Cas., 1915C, 283, 4 N. C. C. A., 167 (pond in street).

"Cases in which liability has been denied on the ground that under the circumstances there was no breach of duty are: Bates v. Nashville, C. & St. L. R. Co. (1891), 90 Tenn., 36, 25 Am. St. Rep., 665, 15 S. W., 1069 (turntable); Cooper v. Overton (1899), 102 Tenn., 222, 45 L. R. A., 591, 73 Am. St. Rep., 864, 52 S. W., 183 (pond); Foster-Herbert Cut Stone Co. v. Pugh (1906), 115 Tenn.,

688, 4 L. R. A. (N. S.), 804, 112 Am. St. Rep., 881, 91 S. W., 199, 19 Am. Neg. Rep., 553 (wagon with low bed) ; Louisville & N. R. Co. v. Ray, supra (standing railroad cars)."

In the case of Benson, Administrator, v. Howard-Park Brick Co., 6 Higgins (6 Tenn. Civ. App.), 497 (affirmed by the Supreme Court), it was held that the owner of a private pond somewhat removed from a highway or public playground is under no obligation to inclose the pond so as to prevent injuries to trespassing children.

In the case of Kelley v. Tennessee Electric Power Co., 7 Tenn. App. 555, it was held that the doctrine of "attractive nuisance" is in derogation of the rule of the common law that a landowner owes no duty to a trespasser on his land except not to willfully injure him, and that, upon the facts of that case, the defendant's power line tower did not come within the class of attractive nuisances.

In the case of DuPont Rayon Co. v. Roberson, 12 Tenn. App., 261, it was held that the attractive nuisance doctrine applies to a swimming pool equipped with objects peculiarly attractive to children, and which was frequented by children, and that, under the circumstances disclosed in that case, the law imposes liability for injuries to children, even though they are technical trespassers, where such injuries are the result of the failure of the owner or person in charge to take proper precautions to prevent injuries to such children by instrumentalities or conditions which he should, in the exercise of ordinary judgment and prudence, know would naturally attract them into unsuspected danger.

In City of Memphis v. Trice, Administrator, 13 Tenn. App., 607, it was held that (1) in an action to recover for the death of a child, where the evidence disclosed that the city, in the construction of one of its streets, had caused to be formed a pond, which pond was not visible from the city street and was not located upon city property, and near the pond were steep embankments upon which small children were accustomed to play, the place, although it might be attractive for children, could not be classified as an attractive nuisance within the law on that subject; and (2) in determining whether a particular instrumentality causing the injury of a child comes within the attractive nuisance doctrine, the courts of necessity must be governed by the particular facts in each case ; that no hard and fast rule of liability or nonliability can be fixed, and that there are classes of cases difficult to distinguish in principle from the "turntable class," yet in which common sense, reason, and justice determine it would not do to apply the doctrine.

The able briefs of learned counsel in the instant case indicate that they are familiar with the authorities we have cited, and there is no occasion for us to further review the cases.

In their brief, the learned counsel for plaintiff emphasize certain evidence that the wooden horses and mortar boards were stacked to

a height of 15 feet by pitching one upon another in such a careless, promiscuous manner that they could be easily toppled over or pulled down, and that just before plaintiff was injured one of the wooden horses on top of the pile was hanging over the edge toward Minnie Ray's home.

But there is not only an absence of evidence that any of the "horses" in the "stack" fell and injured plaintiff, but the inference from the proof is that it was a "wooden horse" that was down in front of the "pile" or stack, with a mortar board on it and with rocks under the legs to steady it, that turned over on plaintiff. It is evident, therefore, that the manner in which the large "pile" or stack of wooden horses and mortar boards was built up—whether negligently or securely—is immaterial in this case, for the reason, if no other, that it was not a proximate cause of plaintiff's injury. Smartwood's Guardian v. L. & N. R. Co., 129 Ky., 247, 111 S. W., 305, 19 L. R. A. (N. S.), 1112, 1116, 130 Am. St. Rep., 465.

However, the testimony of Minnie Ray is to the effect that the wooden horse which injured plaintiff, although not on the stack but on the ground in front of the stack, was standing on rocks placed under the legs to "level it up" because of the unevenness of the ground on which it stood, and that it was "rickety" or unstable.

In some undisclosed manner, the wooden horse thus standing upon the Douglas lot was caused to turn over and fall upon plaintiff's leg. Whether plaintiff or some other agency caused it to overturn is purely a matter of conjecture.

There is no evidence that plaintiff or any other child was attracted to the Douglas lot by the presence of the wooden horses either at the time plaintiff was injured or at any other time. 36 A. L. R., page 136.

In the course of his testimony, Frank Douglas said: "Before this accident happened, I noticed this little boy playing around my premises, sometimes he would be over there like all other children, playing around. I noticed little Junior playing there. I told the Ray boy to stay out before the accident. It was only two or three hours before the accident that I told him to stay out of there. He went away when I told them. . . . I did not warn the little boy to stay away by reason of the fact that these horses and lumber were stacked up that way. I wasn't afraid he would get hurt, he might break up something over there in the house."

The above-quoted testimony of Frank Douglas is the only evidence in the record that plaintiff or any other child had played on the Douglas lot at any time, and there is no evidence that children had at any time played with or upon the wooden horses and lumber in question.

Moreover, it is a matter of common knowledge that the wooden horses, or trestles, and mortar boards involved in this case are simple

appliances in common use by carpenters, house painters, paper hangers, and others engaged in construction work, and are not inherently dangerous instrumentalities. There is no evidence that one of these horses possesses any qualities which would make it unusually attractive to children, and we see no reason to attribute such qualities to it.

"The same degree of care cannot be expected in the case of an article unattractive in itself, not inherently dangerous, and which is in such common use that people, generally, keep it about their premises and are familiar with it, as in the case of an article attractive in itself, or inherently dangerous or so uncommon that people, generally, neither have or use it." 20 R. C. L., page 85, par. 74.

The attractive nuisance doctrine contemplates, as a basis of liability, a danger to be guarded against which is not common and obvious. The property owner has the right to expect that the natural guardians of children who are too young to understand and avoid ordinary dangers will keep such children away from them, or not allow the children to encounter them unless properly accompanied. 36 A. L. R., page 294.

We are of the opinion that the learned trial judge did not err in directing a verdict for the defendant, and the assignments of error are accordingly overruled, and the judgment of the circuit court dismissing plaintiff's suit at his cost is affirmed, and judgment will be entered accordingly. The costs of the appeal will be adjudged against plaintiff's next friend, Minnie Ray.

Crownover and DeWitt, JJ., concur.