McCAY v. DU PONT RAYON CO.—96 S. W. (2d), 177.

Middle Section.   October 26, 1935.

Petition for Certiorari denied by Supreme Court, July 3, 1936.

158

Jas. C. R. McCall, Jr., of Nashville, and J. C. R. McCall, of Huntingdon, for plaintiff in error administrator.

Leftwich & Denny, of Nashville, for defendant in error.

FAW, P. J.   M. C. McCay, as administrator of his infant son, Joe Mac McCay, deceased, has appealed in error from a judgment of the Second circuit court of Davidson county dismissing his suit against Du Pont Rayon Company, a corporation, at his cost, and is here insisting, through assignments of error, brief, and argument, that the trial court erred in sustaining the motion of the defendant below, made at the close of all the evidence, for peremptory instructions in its behalf, and in directing a verdict for the defendant.

The parties will be designated herein as plaintiff and defendant, respectively, according to their attitude on the record in the trial court.

The plaintiff administrator sued the defendant for $50,000 as damages for the alleged wrongful death of his intestate.

In the trial court all the material averments of the plaintiff's declaration were put in issue by the plea of not guilty interposed by the defendant; but in this court the issues are narrowed through the establishment by undisputed evidence at the trial below of many facts in issue under the pleadings, and admitted by defendant, through its attorneys of record on the brief, as hereinafter more specifically stated.

There is evidence of certain facts which are, in substance, averred in plaintiff's declaration, and which will now be stated.

The plaintiff's intestate, Joe Mac McCay, died from drowning on August 3, 1933. He was about five years and five months of age at the time of his death, and was a healthy child of usual intelligence for one of his age. He was the only child of M. C. McCay and wife, Mrs. Ena F. McCay, and this suit was brought for their use and benefit as his surviving next of kin.

Plaintiff, McCay, is the duly appointed, qualified, and acting administrator of said Joe Mac McCay, deceased.

Up to the time of his death, plaintiff's intestate lived with, and was supported and cared for by, his said parents at their home on Jones avenue, in the town of Old Hickory, Davidson county, Tennessee, about two blocks from the place where he was drowned. The house in which deceased lived with his parents was owned by the defendant, and was rented by defendant to the father of the deceased child.

Old Hickory was at that time a town of approximately 7,000 inhabitants, covering an area of several hundred acres, upon which were located several hundred dwelling houses, a number of stores and office buildings, and other buildings usually found in towns of such size. The entire town, with the exception of one public highway passing through it, and possibly one or more small parcels of land used for public purposes, was owned, used, and maintained by defendant. The town had a system of paved streets and sidewalks, a drainage system, and a sewerage system, all of which had been constructed in part by defendant's predecessors in title, and in part by defendant, and which were maintained by defendant.

For approximately nine years prior to, and at the time of, and after, the death of plaintiff's intestate, the defendant owned, controlled and maintained said town as aforesaid, and rented the dwelling houses, stores, and offices therein for profit to numerous tenants, including said M. C. McCay, and the aforesaid streets and sidewalks were maintained by defendant as common passways for the use and benefit of all its tenants and their families and other persons who might visit or pass through Old Hickory.

Three of the streets thus owned and maintained by defendant for the use of its tenants were known as Tenth street, Cleve street and Jones avenue, respectively. The general direction of Tenth street was east and west, and Cleve street was north and south. Cleve street entered Tenth street from the north, but did not extend south of Tenth street at that point. A public school building, fronting south, was situated on the lot abutting on the south side of Tenth street opposite its intersection with Cleve street, and children of the community were accustomed to play on the Tenth street side of this schoolhouse

lot and in the adjacent streets with the knowledge of defendant and without protest or objection on its part.

Jones street ran north and south and intersected Tenth street one block east of Cleve street. The home of the deceased, rented by his father from defendant as aforesaid, was situated on Jones avenue and at the north end of the first block north of Tenth street, or about two blocks (traveling along the streets) from the place where Joe Mac McCay was drowned.

The territory around the intersection of Cleve street and Tenth street was thickly populated, and these two streets at and in the vicinity of that point were much frequented routes of travel for pedestrians and vehicles in Old Hickory. There was a concrete sidewalk 3½ feet wide along the west side of Cleve street down to Tenth street, but no sidewalk or curb along the north side of Tenth street immediately west of Cleve street.

The intersection of Cleve street and Tenth street was on a natural drainage slope, and, when there was rain, the surplus water from the west and northwest collected in an open ditch adjacent to and parallel with the north side of Tenth street, 3 or 4 feet from the macadam, and flowed into a round, corrugated, metal culvert at the northwest corner of the intersection of Tenth and Cleve streets. This culvert was 12 inches in diameter at the intake, and the diameter increased to 15 inches about 4 or 5 feet from the intake. It was approximately horizontal and carried the water under the concrete sidewalk on the west side of Cleve street and under Cleve street to a catch basin about 6 feet long, 4 feet deep, and 2 feet wide at the top (covered by a grating) on the east side of Cleve street, and from thence it passed away in a large underground storm sewer. The west end of the metal culvert (where the water entered) was 18 inches west of the Cleve street concrete sidewalk, and the bottom of the culvert was variously estimated by the witnesses from 2½ to 3 feet below the level of said sidewalk.

On August 3, 1933, an "unusually heavy" rain fell at Old Hickory, beginning shortly before noon, and, as a consequence thereof, surface waters were collected in the ditch leading to said culvert and at the intake to such an extent that the water rose to a height of several inches above the top of the culvert.

Between 12 and 1 o'clock on said day of August 3, 1933, plaintiff's intestate, clad in a bathing suit, or "swimming suit," left his home, with the permission of his mother, to play in the rain with two other children of the neighborhood similarly clad, and these three children went to the intersection of Tenth and Cleve streets, where the deceased, Joe Mac McCay, "stepped off the sidewalk at one side of the ditch and stepped into the deeper water" at the intake of said culvert on the west side of Cleve street and was drawn into the culvert by the

suction, or drawing power, of the water flowing through the culvert, and was drowned. A few minutes after he disappeared beneath the water at the intake his dead body was found near the east end of the culvert and was taken out through the catch basin on the east side of Cleve street.

Children were frequently permitted to play in the rain on the streets of Old Hickory in the manner that the deceased and his two companions were playing at the time he met his death, but there is no evidence that children had ever been seen at any time playing in the ditch where plaintiff's intestate lost his life. The facts we have thus far stated are undisputed.

The plaintiff's declaration contains two counts. The theory of the first count is that there was a "hole or pit" in the "gully or artificial drainage canal" at the point where deceased was drawn into the culvert; that said "hole or pit" was so located and maintained that pedestrians using the sidewalk adjacent thereto were likely and liable to fall therein by making a slight misstep or deviation from the narrow walkway; that this condition was particularly dangerous to children of tender years and immature judgment who made constant use of said walkway with defendant's knowledge and approval; that, notwithstanding the dangerous condition thus described, defendant negligently failed to cover or guard said hole, or give warning thereof; that while said infant, Joe Mac McCay, was on and using said street and sidewalk in play following a rain, and while said hole was "filled with whirling surface waters and the edges thereof were slick and wet," he stepped or fell into said hole and was drowned.

But the proof shows affirmatively, and without dispute, that Joe Mac McCay voluntarily waded into the "gully" or ditch at the place from which he was drawn into the culvert, and did not get into the water in the manner described in the first count as aforesaid, and therefore we need not further consider the first count.

It may be well to say here that plaintiff described two culverts in his declaration and avers that there was a "hole or pit" at the intake of each of these culverts. One of these culverts was that hereinbefore described, and in which Joe Mac McCay was drowned. The intake of the other culvert was on the east side of the west sidewalk of Cleve street, and was designed to receive the water flowing south on Cleve street and convey it into the aforementioned storm sewer. We have found no evidence in the record that the last mentioned culvert, or the alleged "hole or pit" at or near the intake thereof, contributed materially, if at all, to the death of Joe Mac McCay; hence we have confined our statement of the facts to the first mentioned culvert, known in the record as culvert No. 1, and we will give no further consideration to the other culvert, known in the record as culvert No. 2, although in that part of the second count hereinafter

quoted the plaintiff seeks to predicate liability upon alleged negligent construction and maintenance of both of said culverts.

In the second count of his declaration, the plaintiff makes, among others, averments with respect to the alleged negligence of the defendant in the construction and maintenance of its system of surface water drainage at the intersection of Tenth and Cleve streets, as follows:

"Said system of surface water drainage provided and maintained by defendant at said street intersection was wholly inadequate, insufficient, unfit and unsafe for the purposes intended by defendant, as defendant knew, or could and should have known; and upon the occurrence of rain of ordinarily heavy intensity, such as, upon frequently repeated occasions through the year, was accustomed to fall, and did fall, at Old Hickory, and as was reasonably to be expected to fall at any time, the surface waters collected by defendant's said drainage system above said intersection were directed or thrown into said two holes or pits in such excessive quantities, and with such force and violence as to overtax the capacity of said culverts, in the position, condition and location in which they were maintained by defendant, thereby damming up vast quantities of water in and over the tops of said pits or holes, and causing same to flow upon and across the paving of said intersection. Whereby, after the fall of an ordinarily heavy rain, a great pool of surface waters was accustomed to form over a large part of said intersection, many feet or yards in diameter, with whirlpools therein over the site of said two pits or holes, causing strong undertows of water leading into said submerged culverts. Said pool was rapidly fed by rushing streams of surface waters passing down the gully on the north side of Tenth Street; and down the uncurbed gutters on Cleve Street; and was drained by said culverts and by the downgrade slope of streets, gutters and sidewalks below said street intersection.

"Defendant could and should have remedied this condition of insufficient drainage at said point, so as to make said street intersection and sidewalk safe for use by its tenants and their children, either by increasing the grade of descent of said culverts, by installing larger culverts, by adding additional sewer intakes above said point, by cleaning said culverts, or by some other appropriate or adequate method; and all of which defendant was able to do, and could and should have done, long before plaintiff's child was drowned.

"Said condition existed for many months or years prior, and continuously up to August 3, 1933, and was negligently maintained by defendant continuously up to and upon said date, in violation of the duty of care which it owed to said child and its parents.

"Said recurrent whirlpools, covering large, deep and precipitate pits or holes bordering a narrow sidewalk, on both sides, in a pool

of rushing surface waters collected in a street intersection by defendant's defective and insufficient drainage system, was a regularly repeated nuisance, peculiarly attractive and highly dangerous to children of slight age and immature judgment, who were accustomed to make regular, daily use of said streets in play, as defendant well knew; and said condition was likely and liable to cause grave injury to some child or other traveler of the common way, as defendant could and should have known; and said condition was negligently maintained by defendant in said passageway without guarding, remedying, or giving plaintiff or his wife any warning of the same, continuously up to and on said date.

"A heavy rain, such as was reasonably to be expected, fell on August 3, 1933, and surface waters were collected by defendant's artificial drainage system, as aforesaid, into said pits or holes, overflowing the same and forming said pool and whirlpools at said intersection and beside said sidewalk.

"And as the proximate result thereof, said infant, Joe Mac McCay, while on and using said street and/or sidewalk in play, following said rain, as he had a right to do, was attracted to said intersection by said waters, was caught therein and washed into one of said culverts and was drowned, all without fault on his part or upon that of his parents, and solely by reason of defendant's aforesaid negligence."

It should be stated that the evidence does not sustain the averment of the declaration that there was a "hole or pit" at the intake of culvert No. 1, but it appears that the bottom of the ditch was level with the bottom of the culvert, and from that point the ditch gradually grew more shallow back westward (the direction from which the water came) until it reached Lawrence street (the first street west of and parallel to Cleve street) where the ditch headed.

It also appears that, although there was a whirlpool, "like when you open up a stopper in a wash basin and there is a big whirl," at the intake of culvert No. 2 on occasions when the rainfall was sufficiently heavy to temporarily overtax the normal capacity of the culvert, there was no whirlpool at the intake of culvert No. 1.

The proof leaves no doubt that there was an unusually heavy rain at Old Hickory on the occasion in question. The water overflowed the sidewalk at or near the corner of Tenth and Cleve streets on that occasion, but had subsided some and was not over the sidewalk at the time the little boy was drowned.

The plaintiff's witness Kimbro stated that he had "lived in that hollow" for about eight years and at "that particular place" (the corner of Tenth and Cleve Streets) for about a year and a half, and that he had "seen it overflow one time, or probably twice."

The plaintiff's witness Nix, who had lived for about four years in

"the second house from this place," had never seen water overflow the sidewalk, or "overflow in the street" at the place in question.

Referring to occasions when surface water accumulated at the place where Joe Mac McCay was drawn into the culvert, plaintiff's witness Peeler stated that the water "gets away very quickly after a rain."

It was not incumbent on defendant to construct culverts of sufficient capacity to carry off the water as rapidly as it accumulated in the ditches during extraordinary or unusual (although not entirely unprecedented) rains. Haney v. City of Kansas, 94 Mo., 334, 7 S. W., 417.

As we have seen, the plaintiff avers in the second count of his declaration that the condition existing at the intersection of Tenth and Cleve streets as therein described "was a regularly repeated nuisance, peculiarly attractive and highly dangerous to children of slight age and immature judgment, who were accustomed to make regular, daily use of said streets in play, as defendant well knew."

Manifestly the averments to which we have just referred were intended to bring the case within the "attractive nuisance" doctrine; and, accordingly, a large number of adjudged cases dealing with this subject are cited in the brief for plaintiff, and upon these, it is there stated, the plaintiff "chiefly relies" for support of his assignments of error.

A large majority of the cases thus cited are from jurisdictions other than Tennessee. We have examined substantially all of these cases, and it would serve no useful purpose to review them in this opinion. In the introduction to an extended annotation on the subject of "Attractive Nuisances," found in 36 A. L. R., pp. 34-294, it is said:

"The subject is one upon which there has been a marked diversity of opinion. There has been a difference of opinion not only as to whether the doctrine should be recognized or not, but also, in jurisdictions where it has been accepted, as to the conditions under which it is applicable."

There is a "general drift of the courts away from an extension of the rule of the attractive nuisance cases" (Cox v. Alabama Water Co., 216 Ala., 35, 112 So., 352, 356, 53 A. L. R., 1336, 1344); and with reference to this rule the Supreme Court of Mississippi recently (in 1928) said:

"The tendency of the courts recognizing it is to limit, instead of enlarge the scope thereof." Lucas v. Hammond, 150 Miss., 369, 116 So., 536, 537, 60 A. L. R., 1427, 1428.

This doctrine has been recognized by the courts of this state since the case of Whirley v. Whiteman (1858), 1 Head., 610; but in Louisville & N. R. Co. v. Ray (1911), 124 Tenn., 16, 38, 134 S. W., 858, 863, Ann. Cas., 1912D, 910, the court said:

"It should be remembered that while the doctrine is recognized here, and applied in proper cases, the recent authorities have shown a disposition to limit its application. It should further be noted that in all of the cases the court itself has, in one form or another, determined the classes of cases or subjects to which the doctrine applies."

The general tendency of our appellate courts to limit, rather than extend, the application of the attractive nuisance doctrine is evident from an examination of the cases reported since the opinion in Whirley v. Whiteman, supra; Bates v. Railway Co., 90 Tenn., 36, 15 S. W., 1069, 25 Am. St. Rep., 665; Cooper v. Overton, 102 Tenn., 211, 52 S. W., 183, 45 L. R. A., 591, 73 Am. St. Rep., 864; East Tennessee & W. N. C. R. Co. v. Cargille, 105 Tenn., 628, 59 S. W., 141; Burke v. Ellis, 105 Tenn., 702, 58 S. W., 855; Foster-Herbert Cut Stone Co. v. Pugh, 115 Tenn., 688, 91 S. W., 199, 4 L. R. A. (N. S.), 804, 112 Am. St. Rep., 881; Louisville & N. R. Co. v. Ray, supra; Doyle v. Chattanooga, 128 Tenn., 433, 161 S. W., 997, 1000, Ann. Cas., 1915C, 283; Benson, Adm'r, v. Howard-Park Brick Co., 6 Tenn. Civ. App., 497; Verran v. Town of Greeneville, 4 Tenn. App., 422; Kelley v. Tennessee Electric Power Co., 7 Tenn. App., 555; Nashville Railway & Light Co. v. Williams, 11 Tenn. App., 1; DuPont Rayon Co. v. Roberson, 12 Tenn. App., 261; City of Memphis v. Trice, 13 Tenn. App., 607; Ray v. Hutchison, 17 Tenn. App., 477, 68 S. W. (2d), 948.

We are of the opinion that the duty owing by defendant Du Pont Rayon Company to plaintiff's intestate was substantially the same as a municipal corporation would owe to a child under like circumstances. A municipal corporation is the proprietor of the public streets, which are held by it in trust for the convenience of the citizens. Humes v. Knoxville, 1 Humph., 403, 407, 34 Am. Dec., 657. And the construction and maintenance of public streets falls within the proprietary or private aspect of the duties of municipal corporations, rather than their governmental functions. Mayor of Memphis v. Lasser, 9 Humph., 757; Mayor and City Council v. Burns, 131 Tenn., 281, 287, 174 S. W., 1111, L. R. A., 1915D, 1108.

The analogy just indicated seems to be recognized by counsel for plaintiff in their brief, wherein it is said:

"Little Joe Mac McCay and his parents had a right to assume that the defendant landlord was exercising, with respect to the streets in Old Hickory, at least as much care as a municipality with respect to its streets; and that the duty of exercising such care, for a city of seven thousand inhabitants, had been voluntarily assumed by the defendant by virtue of its real estate activities."

Stated generally, the care which a municipality is required to exercise with respect to its streets is that "its duty is only to see that

sidewalks and streets are reasonably safe for persons traveling on them, while exercising ordinary care and caution. It is only bound to use ordinary care and attention to keep its streets and sidewalks in a reasonably safe condition for persons traveling in the ordinary modes, by night as well as by day, while exercising reasonable care and caution." Poole v. Jackson, 93 Tenn., 62, 68, 23 S. W., 57, 59.

The "attractive nuisance" doctrine was applied to the facts of the case of Doyle v. Chattanooga, supra, and it was there held that the city was liable for the death of two boys, eleven and nine years of age, respectively, by drowning in a pond which occupied the whole width of a public street, about 120 feet from a public park. As the basis of the ruling in that case, the court quoted with approval from a Wisconsin case (Busse v. Rogers, 120 Wis., 443, 98 N. W., 219, 64 L. R. A., 183) as follows:

"The central idea is that children are liable always to be upon the public streets, and also are liable to turn aside from traveling and play, or meddle with attractive things left thereon; that a reasonable man must bear this fact in mind, and hence may not negligently or willfully place upon the street a dangerous . . . trap, well calculated to arouse the admiration or curiosity of a child, and, when it has accomplished the natural result which might be reasonably expected escape the consequences by saying that the injured child should not have yielded to his curiosity."

It is obvious that the facts of the Doyle Case, supra, and the facts of the instant case are by no means parallel.

It appears, without dispute, in the instant case, that the paved and traveled part of Tenth street was free from any sort of "water perils" for children, and there is no evidence that, on any previous occasion, a child had been known to wade in the gully along the margin of Tenth street wherein Joe Mac McCay was drowned. Plaintiff's witness, Mrs. Cunningham, lived in the house at the southwest corner of Tenth and Cleve streets (the house nearest to the point where Joe Mac McCay was wading when drowned), and she testified that she had seen children playing in the water out in the street, but did not remember seeing any children playing in the "gully."

It is an elementary principle of law applicable to negligence cases, including attractive nuisance cases, that the defendant is not responsible for injuries which could not have been reasonably foreseen.

It is essential to the application of the attractive nuisance doctrine that a thing must be not only attractive to a child (and therefore affording ground for anticipating the presence of children), but it must also be dangerous to children of tender years, and, although attractive and dangerous, it may nevertheless be common and natural and of a character that makes it impracticable to guard against it.

"The attractive nuisance doctrine contemplates, as a basis of liability, a danger to be guarded against which is not common and obvious. The property owner has the right to expect that the natural guardians of children who are too young to understand and avoid ordinary dangers will keep such children away from them, or not allow the children to encounter them unless properly accompanied." Ray v. Hutchison, supra, 17 Tenn. App., 477, at page 488, 68 S. W. (2d), 948, 955.

The ditch and culvert involved in this case were a part of the general drainage system of Old Hickory, and the proof shows that they were constructed according to "standard engineering practice." It is a matter of common knowledge that similar ditches and culverts exist in many towns throughout Tennessee and elsewhere.

In the case of City of Memphis v. Trice, supra, 13 Tenn. App., 607, at page 616, this court, speaking through Judge Heiskell, quoted with approval from a California case (Peters v. Bowman, 115 Cal., 345, 47 P., 113, 598, 56 Am. St. Rep., 106), which quotation concluded as follows:

"The owner of a thing dangerous and attractive to children is not always and universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural and common or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in short, to the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions." Judge Heiskell then said:

"There are many other cases to the same effect showing among other reasons given the importance attached to the difficulty of making places safe for children. In case of a private owner if he has many places of possible danger, it would be obligatory not only to safeguard one but all of them. In case of a city, it is almost inconceivable what this would mean. Every viaduct separating the grade of street and railroad makes a place of danger for children, yet they are considered essential to promote safety in traffic. At one end of such viaducts leading from the higher to the lower level, from railroad to street or vice versa, will be seen steep and worn pathways, more or less dangerous, very much like the condition complained of in the present case at the ends of the retaining wall. Then all city parks have ponds or lakes, waterscapes intended for scenic beauty. To protect them from children by bill board fences would destroy the purpose of their existence. Every bridge across a bayou affords a place from which children may fall into water. No railing is a sure protection and it is impossible to prevent a child from finding some place at the end of a bridge where he can slide down a bank. The cases above cited show that these considerations are causing the reason and common sense of the courts to

say to the doctrine of the turntable cases 'thus far shalt thou go and no further.' '' See, also, Cobb v. Lowe Mfg. Co., 227 Ala., 456, 150 So., 687, 688.

It should be remembered that under ordinary weather conditions the place in question was not dangerous to children. The possibility of a child being ''sucked'' into the culvert existed only on the occasion of unusually heavy rains and then only for a brief period, and the culvert was therefore dangerous at such rare intervals and under such weather conditions that ordinarily competent and thoughtful men would not anticipate such an accident as befell plaintiff's intestate. Anticipation of injury, in the doctrine of attractive nuisance, means probability, not possibility. Hardy v. Missouri Pac. R. Co. (C. C. A.), 266 F., 860, 36 A. L. R., 1, 5.

We are of the opinion that the learned trial judge did not err in directing a verdict for the defendant. The assignments of error are accordingly overruled, and the judgment of the circuit court dismissing plaintiff's suit at his cost is affirmed, and judgment will be entered accordingly. The costs of the appeal will be adjudged against the plaintiff administrator.

Crownover and DeWitt, JJ., concur.